**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 38801**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2012 Unpublished Opinion No. 779 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: December 31, 2012 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| WILLIAM M. TANKOVICH, JR., | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Defendant-Appellant. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. John P. Luster, District Judge.

Judgment of conviction for malicious harassment and conspiracy to commit malicious harassment, <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent.

_____

GRATTON, Chief Judge

William M. Tankovich, Jr. appeals from the judgment of conviction entered upon the jury verdicts finding him guilty of malicious harassment and conspiracy to commit malicious harassment.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Tankovich, as well as his two brothers, was charged by indictment with one count of malicious harassment and one count of conspiracy to commit malicious harassment. The indictment alleged three overt acts. First, Ira Tankovich (Ira) made contact with Kenneth Requena (Requena), who is Puerto Rican, because of his race, color, and/or national origin and made disparaging racial remarks to Requena. Second, Ira returned to Requena's home with a firearm to cause physical injury to Requena and/or threatened physical injury to Requena. Lastly, Tankovich and Frank Tankovich (Frank) also returned to Requena's home and

1

maliciously made disparaging racial remarks to Requena--with the specific intent to intimidate or harass--because of his race, color, ancestry, and/or national origin. The State moved for a joinder of Tankovich's case with those of Frank and Ira. The district court ultimately granted the joinder and the three men were tried together.

Following a mistrial and a hung jury, the State sought to introduce evidence at the subsequent trial regarding Tankovich's tattoos of SS lightning bolts and a three-leaf clover.[1] The State also requested to be allowed to present the testimony of expert Tim Higgins to explain the significance of Tankovich's tattoos. The district court conducted a hearing outside the presence of the jury to establish the proper foundation for Higgins' testimony. During that hearing, Higgins testified that he "provide[s] administrative oversight for three programs statewide with the Department of Correction both in probation and parole and in the prison system, one being the investigations program, the second being the criminal intelligence program, and the third being the security threat group management program." Higgins explained that security threat groups "could mean criminal gang members, it could mean extremist groups, militia groups, white supremacist organizations, [and] various other groups. . . ." Higgins also explained that Tankovich's tattoos were Aryan neo-Nazi-type symbols usually associated with white supremacists or gang members.

Following the hearing on Higgins' testimony, Tankovich expressed his concerns:

> [M]y biggest concern is that letting this witness testify, all it's going to do is attempt to inflame the jury and say that these people are part of a gang. He has testified that his only expertise is in identifying if people are part of a gang or a security threat or whatever nonsense they're calling it these days, and he has given you no information that he is at all experienced in just testifying about relevant sorts of symbols. He has no doctorate, no degree in history. When discussing these symbols, he says that he hasn't studied the other uses of them.
>     And more importantly, your Honor, it seems clear to me that what the State's hoping to do is have this witness testify and say these people are part of a gang. That's the only purpose of his testimony, even if he doesn't say it.

---

[1] At trial, the State also sought to introduce Ira's tattoos of inverted stars with the words "Aryan Pride." No expert testimony was given on those tattoos because the meanings of the symbols were self-evident.

The State responded to Tankovich's concerns:

> Your Honor, with regards to the potential risk that counsel is referring to, I think that that's something that we have begun to address, certainly, in terms of the nature of the testimony that we'd be presenting to talk about things in terms of risk groups and rather than gangs and try to address some of the concerns the Court has.
>
> We wouldn't be seeking from this witness to testify about these particular defendants and their beliefs, rather, it's specialized testimony that this individual has based on years of experience and training relating to his knowledge of gangs and risk groups that is a part of his everyday work and has been a part of his everyday work for his entire career as a corrections officer.

The district court noted "the foundation that Mr. Higgins has laid here in the preliminary examination could be highly prejudicial in terms of exceeding the boundaries of what it is that would be relevant" since Tankovich is "not on trial for being [a] member[] of a gang." The district court also noted that Higgins' testimony could serve a legitimate purpose as expert testimony on the symbolism of the tattoos. The district court concluded that the testimony:

> [S]hould not be presented to this jury in any way to infer or to imply that [the Tankoviches] had ever been in prison before or that any of these individuals were necessarily current members of any gangs or any gang affiliation or any of those things that Mr. Higgins is primarily entrusted to do in his everyday job.

Accordingly, the district court cautioned the State to avoid extensive inquiry into Higgins' background working for the Department of Correction in order to prevent unnecessary inferences that Tankovich was in prison or a member of a specific gang. The district court further clarified that Higgins could testify about his general job title or his duties. The district court also suggested that the State show Higgins photographs of the tattoos and ask him about his familiarity and knowledge of them, but that he should not characterize the tattoos as being associated with gang members.

In front of the jury, Higgins testified that he works at the Idaho Department of Correction as the coordinator of the investigative and intelligence program and that, as part of his duties, he identifies and categorizes symbols and tattoos in the Department of Correction's population. Regarding the symbolism of the lightning bolts tattoo, Higgins testified that he had seen this symbol approximately 100 times in the past year "on people associated with Aryan neo-Nazi belief systems or white supremacy belief systems." Regarding the three-leaf clover tattoo, Higgins testified that they are "common symbols worn by Aryan white supremacists inside."

3

The jury ultimately found Tankovich guilty of malicious harassment and conspiracy to commit malicious harassment. The district court sentenced Tankovich to a unified five-year term, with two years determinate, suspended the sentence, and placed him on probation. Tankovich timely appeals.

## II.

## ANALYSIS

Tankovich claims that Higgins' testimony suggested that he had been to prison or was a member of a gang which was not relevant. The State argues that the testimony was relevant to the issue of motive.[2] Whether evidence is relevant under Idaho Rule of Evidence 401 is an issue of law which we review de novo. *State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993); *State v. Sanchez*, 147 Idaho 521, 525, 211 P.3d 130, 134 (Ct. App. 2009).

Tankovich complains that Higgins' testimony associating the tattoos with a white supremacist belief system is the same as associating Tankovich with a gang. Further, Tankovich asserts that Higgins' employment with the Department of Correction, together with his statements that he had seen the lightning bolts tattoo "100 times in the last year" and that the three-leaf clover tattoo was a common symbol "worn by Aryan white supremacists *inside*" (emphasis added), suggested that Tankovich had been in prison. This case involves malicious harassment of a person because of that person's race, color, ancestry, or national origin. Tankovich disputed that his activities were so motivated. However, Tankovich acknowledges that motive is relevant, stating: "And while Mr. Tankovich's motive to commit was relevant to the instant charges, his association with a gang was not, nor was the frequency with which Mr. Higgins saw this tattoo in the prison system." Higgins was called in response to an early objection by Tankovich that there was a lack of foundation as to what the tattoo evidence meant and the trial court's suggestion that an expert might be necessary. Higgins testified that the tattoos were associated with Aryan white supremacists. Tankovich does not deny that Aryan white supremacist beliefs include racial animus. Higgins' testimony was specifically tailored to

---

[2]     The State also contends that Tankovich objected to Higgins' testimony on foundational grounds and did not preserve his objection to relevance or undue prejudice. Having reviewed the record, including the various discussions regarding Higgins' testimony, we conclude that Tankovich preserved both relevance and undue prejudice as grounds for objection to Higgins' testimony.

4

identify the tattoos with a particular group's belief system, not a gang, which was never mentioned. Higgins' testimony regarding seeing the lightning bolt tattoo 100 times in the last year came in response to a foundational objection from Tankovich. Higgins' expertise came from his work inside the prison system. He did not testify or imply that such tattoos were only associated with imprisoned Aryan white supremacists or that, because he had such tattoos, Tankovich had previously been imprisoned. Higgins' testimony was relevant to the issue of motive in this case.

Tankovich further argues that even if the Higgins' testimony was relevant, the testimony was unfairly prejudicial. Again, Tankovich contends that Higgins' statements concerning his employment by the Department of Correction, his knowledge of prison tattoos, and association of the tattoos to a particular group's belief system led the jury to infer that Tankovich had been to prison or was a member of a gang. Pursuant to I.R.E. 403 evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. A lower court's determination under I.R.E. 403 will not be disturbed on appeal unless it is shown to be an abuse of discretion. *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991); *State v. Clark*, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct. App. 1989).

The district court in this case clearly recognized the potential for prejudice from Higgins' testimony. The court disallowed certain testimony regarding tattoos, directed the State to refrain from extensive foundation which might prejudice the jury, and precluded references to gangs or prior imprisonment. Higgins never referred to a gang. Instead, he described each tattoo's association to the belief system of a particular group. He did not testify or imply that the group or its belief system was limited to imprisoned persons. He did not testify or imply that such tattoos were necessarily obtained in or limited to the prison setting. He did not testify that Tankovich had been incarcerated. Higgins' frame of reference and source of expertise may have been from his duties in the correction system, but he did not suggest by that fact that the tattoos or the group with which they are associated are necessarily prison or gang related. The district court properly weighed the prospect of unfair prejudice outweighing the probative value of

Higgins' testimony and took steps to minimize any prejudice. The district court did not abuse its discretion in making the I.R.E. 403 determination.[3]

Finally, even if we assume error in the admission of Higgins' statements, such error was harmless. Trial error will be deemed harmless if the reviewing court is convinced beyond a reasonable doubt that the error did not contribute to the verdict. *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). In reviewing for harmless error, the court evaluates the potential prejudice from the inadmissible evidence in the context of the evidence presented at trial. *State v. Yager*, 139 Idaho 680, 687, 85 P.3d 656, 663 (2004) (error in failing to suppress evidence was harmless because probative value of evidence improperly admitted at trial was *de minimis* in light of other evidence properly presented to establish defendant's guilt).

We note, first, that Tankovich does not contend that evidence tending to establish racial animus was not relevant. In other words, he does not directly contend that testimony that Tankovich's tattoos were associated with Aryan white supremacists and that their views included racial animosity would be improper. He agrees that evidence of racial motive would be proper. His complaint here is principally directed at references to the prison setting, that is, Higgins' testimony that he had learned of the tattoos' significance from his work in the prison setting, that there are a number of prisoners with such tattoos, and that the group with which they are associated has a particular belief system. Tankovich asserts that these references lead to the "inescapable" conclusion that Tankovich had been in prison and in a gang. As indicated above, the prison references were incidental to the main thrust of Higgins' testimony which directly related to racial motive.

Testimony at trial established that the Requenas were outside their home. Tankovich and his brothers drove by in a truck, stopped at a nearby stop sign, backed up in front of Requena's house and then confronted Requena. On one side of the truck a swastika had been drawn in the dirt on the truck and the words "Born 2 Kill" had been drawn on the other side. The Tankovich brothers acted aggressively toward Requena and he asked his wife to call 911 and get his gun, which she did. The

---

[3] As noted, Higgins' testimony regarding having seen the lightning bolt tattoo on 100 occasions in the past year was in response to Tankovich's objection to a lack of foundation. The district court correctly noted that the "State was trying to proceed with a minimal amount of foundation in response to the concerns that the Court had articulated earlier. If you have a foundational objection, I suspect it's probably a legitimate objection, and perhaps some more foundation can be laid."

Tankovich brothers threatened to return and departed before the police arrived and took a statement from the Requenas and a neighbor. The Tankovich brothers returned, twenty to thirty minutes later. Tankovich and his brother Frank approached on foot with a pit bull. They began to threaten Requena. Ira approached on foot from the other direction with a gun, which he threw in the grass as police approached, having again been called to the scene. While the police talked with Tankovich and Frank, the two men repeatedly called Requena a "fuckin' beaner" and Tankovich threatened that they would "take care of business" and take care of this "beaner."

We are convinced from our review of the record that a rational jury would have found Tankovich guilty of the charged crimes even without the alleged improper portions of Higgins' testimony. We do not believe that the challenged portions of Higgins' testimony contributed to the conviction. We therefore conclude that if it was error, it was harmless beyond a reasonable doubt, *Perry*, 150 Idaho at 227, 245 P.3d at 979, and is not grounds for reversing Tankovich's judgment of conviction. I.R.E. 103.

## III.
## CONCLUSION

The testimony concerning Tankovich's tattoos was relevant to a material and disputed issue concerning the crime charged. Likewise, the testimony was not unfairly prejudicial. Lastly, even if the district court erred in admitting Higgins' testimony regarding Tankovich's tattoos, the evidence was harmless in light of the other admissible evidence showing Tankovich's guilt. Therefore, Tankovich's judgment of conviction is affirmed.

Judge LANSING and Judge MELANSON **CONCUR.**